UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

ALIEAH WARD, et al.,

    Plaintiffs,

v.                                                                   Case No. 10-02308

SHELBY COUNTY SHERIFF'S
DEPARTMENT, et al.,

    Defendants.

## OPINION AND ORDER GRANTING DEFENDANT SHELBY COUNTY'S SECOND MOTION FOR SUMMARY JUDGMENT AND TERMINATING AS MOOT THE PARTIES' REMAINING MOTIONS

Before the court is Defendant Shelby County's ("Defendant's" or the "County's") second motion for summary judgment. Plaintiffs have responded in opposition, and the court determines that a motion hearing would be neither helpful nor necessary. *See* W.D. Tenn. LR 7.2(d). As an initial matter, the court determines that Plaintiffs' request to postpone consideration of the motion to allow additional discovery is not warranted. Because Plaintiffs have failed to raise a genuine issue of material fact with respect to their claim that Defendant is liable for a deliberate indifference to the serious medical needs of pretrial detainee David Oswalt ("Decedent"), the court will grant summary judgment to the County. This ruling disposes of the only claim remaining in this lawsuit, and so the court will also terminate as moot all other pending motions and enter judgment for Defendants.

## I. BACKGROUND

On April 23, 2009, Memphis Police arrested Decedent and placed him in custody at the Shelby County Jail (the "Jail") for criminal trespass and vandalism after he repeatedly beat on his mother's door and refused to leave her property. (Record of Arrest, Coleman Aff. Ex. B, Dkt. # 35, at 3-4.) As part of the booking process, Decedent was given a preliminary medical screening, during which he was advised on his right to health care, his hypertension was discovered and noted, he was placed in a chronic care program, and his prescription medications were ordered. (Coleman Aff. ¶ 13(C), Def.'s 1st Mot. Summ. J. Ex. 1, Dkt. # 33-1; *see also* Medical Records 1-14, Coleman Aff. Ex. C, Dkt. # 35, at 5-19.) During this medical screening, Decedent complained of neck and shoulder pain. (Coleman Aff. ¶ 13(C); Medical Records 5.)

On the night of April 25, 2009, Decedent again complained of neck and shoulder pain. (Sanders Interview 2, Pl.'s Resp. to Def.'s 2d Mot. Summ. J. Ex. 1, Dkt. # 96-1.) In response to these complaints, the Deputy Jailer on duty, Thelma Sanders, contacted the on-duty representatives of Correct Care Solutions ("CCS")—the Jail's contract medical provider—and asked for guidance. (*Id.*) CCS told Sanders that Decedent had already been given his medication on the 2:00-10:00 p.m. shift. (*Id.*) Sanders told Decedent about her conversation with CCS, and Decedent responded that he had in fact not received his medication. (*Id.*) According to Sanders, Decedent "continued to holler, he continued to moan and groan and said . . . I'm in a lot of pain[,] I'm sick[,] . . . I'm dying get me to the hospital." (*Id.* at 3.) In response, Sanders again contacted CCS. CCS told her that Decedent needed to fill out a sick call form and that "we only do emergencies on [the] 10 [p.m.] to 6 [a.m. shift]." (*Id.*) Decedent refused to fill out a sick

2

call form and continued crying out for help. (*Id.*) Sanders concluded that his condition was "not severe enough" to justify calling for emergency medical care. (*Id.* at 5.)

The next morning, Decedent was awake and responsive. (Coleman Aff. ¶ 13(F).) He had his armband checked at approximately 6:00 a.m., had breakfast at around 8:00 a.m., came out of his cell for medication at about 10:15 a.m., and left his cell again for lunch. (*Id.* ¶ 13(G).) At approximately 1:00 p.m., jail personnel found Decedent passed out on the floor beside his bed. (*Id.* ¶ 13(H); Medical Records 15.) CPR was administered, and Decedent was taken to Regional Medical Center where doctors pronounced him dead. (Coleman Aff. ¶ 13(H); Autopsy Rep. 1, Coleman Aff. Ex. E, Dkt. # 35, at 22-36.) An autopsy later determined that his death resulted from atherosclerotic and hypertensive cardiovascular disease. (Coleman Aff. ¶ 13(I); Autopsy Rep. 2.)

Following Decedent's death, Plaintiffs, his children, brought this suit seeking wrongful death damages from multiple Defendants. The County, along with other Defendants, filed a first motion to dismiss or, in the alternative, for summary judgment on July 15, 2010. After considering the motion, the court dismissed all claims against the County except one, Plaintiffs' § 1983 claim for deliberate indifference to Decedent's medical needs. In relation to this claim, the court determined that summary judgment could not be properly considered until discovery had taken place. The court entered a scheduling order setting a discovery deadline of December 15, 2011, and a dispositive-motion deadline of January 15, 2012.

The County mailed to Plaintiffs its first set of interrogatories and requests to produce on June 1, 2011. Plaintiffs neglected to respond to these discovery requests,

3

prompting the County to file a motion to compel on October 19, 2011. Plaintiffs did not file a response to the motion to compel, but on November 10, 2011, moved for a stay of discovery until the court decided their pending motion for reconsideration of the order dismissing CCS as a party to Plaintiffs' amended complaint. Although the County opposed the motion to stay, the court granted it on December 19, 2011. On January 9, 2012, the County filed this second motion for summary judgment on Plaintiffs' deliberate-indifference claim. In the meantime, all of Plaintiffs' claims against the other remaining Defendants have been dismissed.

## II. STANDARD

Under Federal Rule of Civil Procedure 56, a court should grant summary judgment when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial, entry of summary judgment is appropriate." *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)). "In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003).

It is not the Court's duty to weigh the evidence in search of the truth, but rather, to determine if the evidence produced creates a genuine issue for trial. *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "The moving party

4

discharges its burden by '"showing"—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.'" *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) (quoting *Celotex*, 477 U.S. at 325). In response to this "showing," the non-moving party must do more then demonstrate "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "[T]he nonmoving party must '. . . designate specific facts showing that there is a genuine issue for trial.'" *Horton,* 369 F.3d at 909 (internal quotation marks omitted) (quoting *Celotex*, 477 U.S. at 324). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson*, 477 U.S. at 251-52.

The existence of a factual dispute alone does not, however, defeat a properly supported motion for summary judgment—the disputed factual issue must be material. *See id.* at 252. A fact is material for purposes of summary judgment when proof of that fact would establish or refute an essential element of a claim or a defense advanced by either party. *Kendall v. The Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984).

### III. DISCUSSION

#### A. Plaintiffs' Request for Additional Discovery

In responding to the County's motion, Plaintiffs asked for clarification regarding the present posture of the case, stating that they understood "that the question involving the presence or absence in the case of Defendant CCS would be resolved prior to the Plaintiffs and Defendant Shelby County continuing to litigate the claims and defenses, upon which discovery remains." (Pls.' Resp. to Def.'s 2d Mot. Summ. J. ¶ 2, Dkt. # 96.) Essentially, Plaintiffs assert that the County's request for summary judgment is

premature, and the court should not grant it without allowing Plaintiffs more time for discovery.

Plaintiffs neglect to explain how, and the court sees no reason why, additional discovery would make a difference to the disposition of this matter. As detailed above, Plaintiffs agreed to a scheduling order which set December 15, 2011, as the deadline for discovery and January 15, 2011, as the deadline for dispositive motions. The court granted Plaintiffs' motion to stay discovery just days short of the December 15 deadline; no request was made to adjourn or otherwise extend the dispostive-motion deadline. Plaintiffs have submitted a response to the merits of the summary judgment motion that includes a fact exhibit and an expert report. Nowhere in that response do Plaintiffs identify what further discovery they wish to obtain from the County, nor do they allege the existence of additional facts favorable to their position that they believe may be adduced in subsequent discovery. Moreover, the County's motion to compel evinces that, throughout this litigation, Plaintiffs have been recalcitrant in complying with Defendants' discovery requests. Under these circumstances, the court does not consider it appropriate to allow Plaintiffs the benefit of more discovery before considering the merits of the County's motion.

## B. The § 1983 Claim

Section 1983 provides a cause of action against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any . . . person . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. To establish a claim under § 1983, a plaintiff must prove "both that 1) she was

6

deprived of a right secured by the Constitution or laws of the United States and 2) the deprivation was caused by a person acting under color of state law." *Redding v. St. Eward,* 241 F.3d 530, 532 (6th Cir. 2001) (citing *Simescu v. Emmet Cnty. Dep't of Soc. Servs.*, 942 F.2d 372, 374 (6th Cir. 1991)). Additionally, Defendant, "a local government[,] may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Instead, "civil rights plaintiffs suing a municipal entity under 42 U.S.C. § 1983 must show that their injury was caused by a municipal policy or custom." *L.A. Cnty., Cal. v. Humphries*, 131 S. Ct. 447, 449 (2010). Plaintiffs cannot clear either hurdle.

### 1. *Deliberate Indifference*

Plaintiffs argue that Defendant violated Decedent's constitutional right to adequate medical treatment under the Fourteenth Amendment, giving them a cause of action under § 1983. Failure to provide prisoners with adequate medical treatment violates the Eighth Amendment and is actionable under § 1983 if it amounts to "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Although the Eighth Amendment only applies to prisoners post conviction, the Fourteenth Amendment provides pretrial detainees with an analogous right. *Watkins v. City of Battle Creek*, 273 F.3d 682, 685-86 (6th Cir. 2001) (citing *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)). A deliberate-indifference claim has both a subjective and objective component: first, Plaintiffs "must demonstrate 'the existence of a sufficiently serious medical need'"; second, they "must demonstrate that the defendant possessed 'a sufficiently culpable state of mind in denying medical care.'" *Estate of*

7

*Carter v. City of Detroit*, 408 F.3d 305, 311 (6th Cir. 2005) (internal quotation marks omitted) (quoting *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004)).

Plaintiffs are likely able to show that Decedent's medical condition was sufficiently serious to require care. "A serious medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008) (quoting *Blackmore*, 390 F.3d at 897). Here, Plaintiffs have provided an affidavit from a consulting medical expert, Dr. Steven M. Simons, that Decedent's presentation on the night of April 25th was severe enough to warrant medical evaluation and, had Decedent been in acute care at the time of the cardiac arrest that later took his life, he would likely have survived. (Simons Expert Rep. 2, Pls.' Resp. to Def.'s 2d Mot. Summ. J. Ex. 2, Dkt. # 96-2, at 19-20.) Moreover, Sanders stated that, on the night of April 25, 2009, Decedent repeatedly cried out in pain, insisted that he needed medical attention, and told jailers that he was dying. (Sanders Interview 3.) In light of Decedent's hypertension diagnosis, the testimony of Plaintiffs' expert, and evidence of Decedent's behavior on April 25, 2009, a jury might conclude that Decedent had a serious medical need.

Plaintiffs fail, however, to provide evidence that the Defendant or its agents possessed a sufficiently culpable state of mind in denying Decedent medical care, as required by the second prong of the deliberate indifference test. The Supreme Court articulated the required mental state in *Farmer v. Brennan*, 511 U.S. 825, 837 (1994): "The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Further

clarifying this standard, the Sixth Circuit has held that "[i]f an officer fails to act in the face of an obvious risk of which he should have known but did not, the officer has not violated the Eighth or Fourteenth Amendments." *Watkins*, 273 F.3d at 686 (citing *Farmer*, 511 U.S. at 837-38). Thus, it is not enough for Plaintiffs to establish that a jail employee *should* have recognized the seriousness of Decedent's condition. They must establish that they *did* in fact recognize Decedent's medical need. Plaintiffs cannot meet this burden.

The primary evidence Plaintiffs offer in support of their claim that Defendant's employees acted with a sufficiently culpable state of mind is the transcript of an interview with Sanders, the jailer who responded to Decedent's complaints of pain on April 25th.[1] According to Plaintiffs, "Sanders' statement indicates she fully appreciated that an emergency situation was present and/or imminent" and yet chose not to call a "Code White" for emergency care. (Pls.' Resp. to Def.'s 2d Mot. Summ. J. 4.) If this were true, it would suggest that Sanders and perhaps other jailers did recognize that Decedent was facing a medical emergency and chose not to act. However, this is not the situation Sanders described.

In response to Decedent's complaints of pain on the night of April 25, 2009, Sanders repeatedly contacted CCS concerning Decedent's condition. In response to Sanders's first call, CCS told her that Decedent had already received his medication, and in response to the second, CCS told her that it only deals with emergencies during

---

[1]The County rightly points out that this interview transcript is not in admissible form. However, since consideration of the evidence will not change the outcome of this order and, presumably, Plaintiffs could obtain the same evidence in admissible form by trial, the court analyzes the evidence as if it were admissible.

9

the 10:00 p.m. to 6:00 a.m. shift and that Decedent should fill out a sick call. Decedent refused to fill out a sick call, and Sanders then considered placing an emergency call—a "Code White"—but chose not to because Decedent "had consciousness, he was aware; he was talking to me, relating to me. He didn't look to me like he was finna [sic] pass out." (Sanders Interview 5.)

Sanders's recounting of these events shows that, first of all, she did take action in response to Decedent's requests for medical attention: she twice contacted CCS, and they told her Decedent could only be seen at that time if it was an emergency. When Sanders relayed that information to Decedent, he reiterated his belief that he needed medical assistance, yet he would not place a sick call—the normal means through which inmates get access to the jail's health-care professionals. (Coleman Aff. ¶ 11.) This fact, combined with Sanders's observation that Decedent was alert and aware, led her to decide that Decedent's condition did not require emergency care. Perhaps others in Sanders's position might have come to a different conclusion, but her testimony indicates that she did not, and hence she did not have the requisite state of mind to satisfy the second prong of the deliberate indifference test.

Apart from Sanders's testimony, Plaintiffs argue that Decedent should have received more thorough care as a result of his initial medical screening. They point out that, upon intake, Decedent's blood pressure was measured at 176/106, his heart rate was measured at 94 beats per minute, and he complained of neck and shoulder pain. (Medical Records 2, 5.) While medications were ordered for Decedent and he was to have regular blood pressure checks, Plaintiffs claim that his medical records and statements to Sanders suggests that he received neither. But even if these allegations

10

prove true, they at most suggest "negligen[ce] in diagnosing or treating [Decedent's] medical condition," a wrong not within the scope of the Eighth and Fourteenth Amendments' protection. *Estelle*, 429 U.S. at 106. Plaintiffs have not presented any evidence that medical officials at the Jail refused or delayed treatment out of a deliberate indifference to Decedent's serious medical need, and so they have failed to establish a deprivation of Decedent's constitutional rights.

### 2. Municipal Liability

Even if Plaintiffs had demonstrated a genuine dispute of material fact as to a violation of Decedent's Fourteenth Amendment rights, they have not shown that Defendant could be held liable for it. "[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *see also Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 122 (1992) ("The city is not vicariously liable under § 1983 for the constitutional torts of its agents: It is only liable when it can be fairly said that the city itself is the wrongdoer."). In addition to being liable for unconstitutional acts that stem from an institutionalized policy or custom, a government entity may be held responsible for acts resulting from deficient training in either quality or amount. A government entity "is liable under § 1983 for failure to train if the Plaintiff can prove three elements: (1) 'that a training program is inadequate to the tasks that the officers must perform'; (2) 'that the inadequacy is the result of the [entity]'s deliberate indifference'; and (3) 'that the inadequacy is closely

related to or actually caused the plaintiff's injury.'" *Plinton v. Cnty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008) (quoting *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989)).

Plaintiffs claim that Defendant is liable for the unconstitutional acts of its employers based on two policies or customs: (1) disregarding "the serious medical needs of inmates admitted under suspicion of alcohol or drug abuse . . . in favor of the practice of 'sobering up' the inmate through detention" and (2) "only providing medical care for emergencies during the overnight hours."[2] (Pls.' Resp. to Def.'s 2d Mot. Summ. J. 10.) Neither contention gives weight to Plaintiffs' *Monell* claim.

First, Plaintiffs provide no evidence that Defendant has a policy or custom of refusing to provide medical assistance to inmates suspected of abusing drugs or alcohol. The only evidence in the record related to this claim is provided by Defendant in its affidavit of Jail Division Director James E. Coleman. According to Coleman, the Jail has a special unit for inmates needing care related to drug or alcohol abuse. (Coleman Aff. ¶ 14.) If anything, this averment implies that Defendant pays *more* attention to the medical needs of prisoners known or suspected to have engaged in substance abuse. More importantly, however, the court sees nothing in the record to suggest that Decedent was any way affected by the Jail's policies regarding drug or alcohol users: Nothing in the parties' briefs or in Decedent's arrest or medical records indicates that he was suspected of substance abuse at the time of his arrest or during

---

[2]In their amended complaint, Plaintiffs also aver that Decedent's alleged constitutional injury resulted from Defendant's failure to train and supervise jail employees. (*See* Am. Compl. ¶¶ 28, 30.) However, this theory of liability is not raised in Plaintiffs' response to the summary judgment motion and there is no evidence in the record to support it. Coleman attests that all deputy jailers are properly trained and supervised as to the inmates' right to medical treatment. (Coleman Aff. ¶ 4.)

12

his tenure at the Jail, or that his medical treatment at the Jail was in any way based on such an assumption.[3]  Accordingly, any harm suffered by Decedent cannot be the result of the Jail's unconstitutional treatment of drug or alcohol users.

Plaintiffs' second argument fares no better.  They assert that the Defendant has a policy of ignoring all inmates' non-emergency medical issues during overnight hours.  Plaintiffs look to Sanders's interview and Coleman's affidavit for supporting evidence.  Sanders reports that she was told by CCS that only medical emergencies are addressed during the 10:00 p.m. to 6:00 a.m. shift.  (Sanders Interview 5.)  Coleman discusses Decedent's jail record in his affidavit and observes that it contains a note, written by Sanders, that CCS told her that "the decedent should fill out a sick call request, since they only handled medical emergencies on that shift."  (Coleman Aff. ¶ 13(E).)

At the outset, it is important to note that both of these statements are based on a comment made to Sanders by a CCS nurse who admitted he did not usually work the night shift.  (*See* Sanders Interview 3.)  This probably makes them inadmissible hearsay that the court cannot consider on summary judgment.  *See Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007).

Aside from that, and even if the court assumed that this isolated comment evinced a policy of the type Plaintiffs allege, they still cannot show that it caused harm

---

[3]Again, Plaintiffs' amended complaint alleges that Defendants made a "subjective determination" that Decedent was under the influence of drugs and, "[r]ather than afford him medical care, they simply hosed him down to keep him quiet." (Am. Compl. ¶ 25.) This averment, which was relied upon in the court's earlier decision to deny the County's motion to dismiss the original complaint, is not born out anywhere in the record, nor is it reasserted in Plaintiffs' summary judgment briefing.

to Decedent. Prisoners at the Jail alerted medical personnel of their need for care by making a sick call request, (Coleman Aff. ¶ 11), a policy that Plaintiffs have never challenged. Decedent declined to do this. When Sanders relayed his complaints and symptoms to CCS personnel, they, like Sanders, apparently determined that he did not need emergency care and instructed that he fill out a sick call. When he did not do so, he put himself outside of the Jail's accepted process for obtaining medical attention, thereby preventing the medical professionals employed by CCS from reevaluating the seriousness of his condition and his need for care.

Moreover, there is no indication that, after his interactions with Sanders, he continued to complain of neck pain or renewed his requests for medical treatment, even though he had multiple interactions with jail employees throughout the next morning, when the purported "emergency care only" policy would no longer be in effect. The Jail's records even reflect that he left his cell to receive medication at around 10:15 a.m., implying that he had contact with some sort of medical personnel at that time. (Coleman Aff. ¶ 13(G).) Therefore, it cannot be said that the Jail's policies for providing medical treatment caused any injury suffered by Decedent.[4] Accordingly, Plaintiffs have not demonstrated a genuine dispute of material fact as to whether they can prevail on their § 1983 claim against Defendant.

## IV. CONCLUSION

---

[4] The court observes that the problem, in fact, may more likely have been that Decedent did not follow those policies. Had Decedent made use of them, they might have proven effective. The court, of course, makes no factual finding as to such observation.

For the above reasons, IT IS ORDERED that Defendant's second motion for summary judgment [Dkt. # 93] is GRANTED.

IT IS FURTHER ORDERED that the County's motion to compel [Dkt. # 81] and the parties' joint motion to continue [Dkt. # 101] are TERMINATED AS MOOT.

  s/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated: September 24, 2012

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, September 24, 2012, by electronic and/or ordinary mail.

  s/Lisa Wagner
Case Manager and Deputy Clerk
(313) 234-5522